**Walter Carl GORDON**

v.

**MAINE REDUCTION COMPANY, INC. and Travelers Insurance Company.**

Supreme Judicial Court of Maine.

June 2, 1976.

Grossman, Faber & Miller, P.A. by Barry M. Faber, Rockland, for plaintiff.

Berman, Berman & Simmons, P.A. by Jack H. Simmons, Lewiston, for amicus curiae.

Rudman, Rudman & Carter by Gene Carter, John M. Wallach, Bangor, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

PER CURIAM.*

On July 24, 1972, Walter Gordon, while employed by the Maine Reduction Company, Inc. as an electrical repair worker, was burned on the hands, arms, chest and face when a switchboard he was checking exploded. By approved agreement the claimant was granted compensation benefits of $64.36 per week. On September 22, 1972, the claimant filed a Petition to Determine the Extent of Permanent Impairment with the Industrial Accident Commission, alleging that the July 24 injury permanently damaged the usefulness of his left hand, eyes and left shoulder. The employer challenged these allegations through numerous hearings and on March 25, 1974, filed a Petition for the Forfeiture of Compensation Benefits pursuant to 39 M.R.S.A. § 65. The employer's petition alleged that the evidence indicated the availability of a reasonable course of medical care which would reduce the extent of the claimant's physical impairment and that the claimant had refused to undergo that treatment. On July 10, 1974, the Commissioner found for the employer and suspended proceedings with respect to the claimant's petition until he submitted to certain medical procedures. The claimant appealed to the Superior Court in Waldo County which entered a pro forma decree affirming the Commissioner's decision. Claimant now appeals to this Court. We sustain his appeal.

* The opinion in this case was written by Weatherbee, J., and adopted by the Court after his death.

The principal witnesses at the hearings below were the claimant and Dr. Martin Sensenig, a specialist in thoracic and vascular surgery. Dr. Sensenig testified that he first examined the claimant on December 4, 1972, at which time the claimant had informed him that he experienced a sensation of cold in his hands which turned white and became numb in response to cold and that he had lost sensation in his fingertips. The physician testified that he had examined the claimant and found that his bilateral grip was weaker than normal, especially in the left hand. Dr. Sensenig believed that the claimant might be suffering from Raynaud's phenomenon, a disease of the vascular system, with vascular spasms secondary to injury. The claimant again visited the physician on January 17, 1974, at which time he noted that the claimant had a loss of abduction of his left arm of about ten degrees. The employer does not challenge the claimant's contention that his condition was caused by the accident on July 24.

Dr. Sensenig believed that a surgical procedure called a sympathectomy would improve the claimant's condition, but that the operation should be preceded by a sympathetic block. The block was described as an injection of novocain or xylocaine into the neck in the region of the sympathetic chain which would temporarily anesthetize the sympathetic nerves, simulating the result of a sympathectomy. The physician explained that the block would be a diagnostic aid to determine whether the patient would benefit from a sympathectomy, since a temporary objective improvement as a result of the block would indicate the efficacy of the proposed surgery. Dr. Sensenig testified that the block was not performed because the claimant did not wish to submit to it. He further testified that the block is commonly used to determine the course of treatment for a patient with the claimant's symptoms.

When questioned about the hazards of the block, the physician responded that when the injection is placed in the neck some air may get into the pleural space collapsing the lung. Because air in the pleural space does not injure the lung, the doctor said that this possibility was more one of temporary unpleasantness than a real hazard.

The doctor further testified that a sympathectomy for the claimant would probably be beneficial because it had been successful in other similar cases and would be a reasonable procedure for improving the claimant's condition. He considered the risk of dying in surgery to be very low statistically, probably one-half of one percent. A possible hazard of the sympathectomy is Horner's Syndrome which results when too much of the stellate ganglion is removed. This syndrome is a condition in which the eye does not open as far as a normal eye and the pupil is somewhat smaller. It is a cosmetic matter rather than an impairment of the functioning of the eye.

In sum the doctor testified that a sympathectomy could be considered likely to improve the condition of the claimant, particularly if the nerve block relieved the numbness and cold which affects the patient's hands. Because a sympathectomy is elective surgery, the doctor testified that the claimant would have to be evaluated as to his fitness to withstand the procedure and that a physical exam, complete history, electrocardiogram and chest x-ray would have to be taken before the surgery would be scheduled.

The claimant testified that he knew that a sympathectomy had been proposed to him but that he did not wish to undergo that surgery. His refusal was influenced by his conversations with others who had undergone or knew persons who had undergone a sympathectomy and had told him that the operation was painful and not beneficial. He also stated that he believed that his age (52) was against him and that he might be worse off after the operation than before.

The Commissioner concluded that the risks involved in a nerve block were negli-

gible and that if the block proved to be successful, the claimant should then be evaluated to determine whether his physical condition would permit the surgery. The Commissioner found unreasonable the claimant's refusal to proceed with the nerve block and suspended proceedings on his petition to determine impairment until the nerve block procedure was performed and its results evaluated.

*The Commissioner's Decree*

■ Claimant argues that the Commissioner's decree was legally and factually in error. We do not doubt that under 39 M.R.S.A. § 65 [1] a claimant's unreasonable refusal to submit to surgery or any reasonable examination attendant thereto is an affirmative defense to the employer's obligation to continue to provide compensation benefits and that the employer has the burden of proof on this issue. *See Stratakos v. Wright, Pierce, Barnes & Wyman,* Me., 272 A.2d 363 (1971). Pursuant to 39 M.R.S.A. § 65, the Commissioner found that the claimant had symptoms of Raynaud's phenomenon with vascular spasms secondary to injury, the recommended treatment for which is a sympathectomy, the success of which can be partially determined by the performance of a nerve block. The Commissioner also found that the risks attending a nerve block are negligible. We believe that these findings of fact are supported by the evidence and are therefore final. The sole question on this matter is whether the employer has sustained its burden of proving that the claimant's refusal to submit to the nerve block procedure is unreasonable. We do not believe that it has.

■ The question of what constitutes an unreasonable refusal to submit to medical treatment under 39 M.R.S.A. § 65 has never been decided by this Court. In the one case where the issue did arise (*Beaulieu's Case,* 124 Me. 83, 126 A. 376 (1924)), we upheld the Commission's finding that the claimant's refusal to submit to surgery was reasonable where medical testimony established that the operation was painful and the success of the proposed surgery was in doubt. Although not decided under 39 M.R.S.A. § 65, our affirmation of the Commission's finding in that case could reasonably imply the obverse of the proposition there established—that is, where the risk of surgery is insubstantial and the probability of its success high, the claimant's refusal to submit to the operation is unreasonable and will result in a forfeiture of compensation benefits.

Kentucky, which has a statute similar to 39 M.R.S.A. § 65, has adopted a like standard under which a claimant's refusal to submit to a major operation is reasonable unless the prospects for failure and the risk to health are minimal. *Beth-Elkhorn Corp. v. Epling,* Ky., 450 S.W.2d 814 (1970); *Hefley v. E. I. duPont de Nemours & Co.,* Ky., 424 S.W.2d 396 (1968). This standard requires the Commission to make its decision as to the reasonableness of the claimant's conduct by weighing the probability of the success of the proposed treatment against the risks to the claimant, thus providing an objective limitation on the Commission's authority to deny compensation once the claimant's right to benefits under the Act has already been established. Such a calculus of risk and success would embrace a multitude of variables, including the claimant's age and condition.

1. "If any employee refuses or neglects to submit himself to any reasonable examination provided for in this Act, or in any way obstructs any such examination, or if he declines a service which the employer is required to provide under this Act, then, upon petition of said employer and hearing before the commission, such employee's rights to compensation shall be forfeited during the period of said infractions if the commission finds that there is adequate cause to do so." 39 M.R.S.A. § 65. Among the required services are "reasonable and proper medical, surgical and hospital services . . . ." 39 M.R.S.A. § 52.

In the instant case, the Commissioner's decree requires the claimant to submit to a diagnostic procedure as a preliminary to a surgical procedure.

■ The Commissioner's conclusion that the risks of the nerve block procedure were negligible was supported by the record below. However, his evaluation of its probable benefits were premature. The purpose of the nerve block is only to aid in determining the probable efficacy of a later sympathectomy, the probable success and risk of which will ultimately be in issue. Dr. Sensenig testified that although the sympathectomy involves a very small statistical risk of death, it was a "major surgical endeavor" and would not be undertaken without a complete evaluation of this particular patient's fitness to withstand surgery. Until this workup is done and its results obtained it cannot be known whether this patient would be a proper subject for a sympathectomy. The nerve block, of course, could be of no benefit at all if the employee is unfit for the surgery.

■ Although the risks involved in a nerve block may be negligible, it constitutes a substantial invasion of the patient's person and one which we believe the employee should not be required to undergo until it can be determined that he should also reasonably submit to the ultimate surgical procedure in the event the nerve block does indicate its appropriateness.[2] The reasonableness of this particular employee's submission to the surgery cannot yet be determined.

Although the employee has thus far expressed an unwillingness to have either the nerve block or the surgery, this disinclination would become moot if he is found to be an unfit subject for surgery.

We must therefore reverse the Commissioner and deny the employer's petition for its failure to prove that the refusal was unreasonable.

*Attorney's Fees*

■ The appellant asks whether counsel for the employee who prosecutes or defends an appeal of a petition under the Workmen's Compensation Act is entitled to collect from his client a fee in addition to that ordered by this Court under the provision of 39 M.R.S.A. § 103. Our answer is that he may not.

The controlling language in section 103 reads:

"In all cases of appeal the law court may order a reasonable allowance to be paid to the employee by the employer for expenses incurred in the proceedings of the appeal including the record, not however to include expenses incurred in other proceedings in the case."

Professor Larson, after examining the general situation concerning an employee's counsel fees, concludes that

"[t]he basic rule applicable to a compensation case is the same as that for any other kind of case: Each party pays his own lawyer, win or lose." 3 A. Larson, Workmen's Compensation Law, 354.39 (1973).

The obvious social disadvantages to be expected from requiring an incapacitated employee to pay his own counsel fees from a weekly compensation which is only a fraction of his former earnings are described by Professor Larson:

"When, however, this practice is superimposed upon a closely-calculated system of wage-loss benefits, a serious question arises whether the social objectives of the legislation may to some extent be

---

2. We realize that it can be argued somewhat conversely that it is unprofitable to do a complete workup for surgery without some indication from a nerve block that the surgery can be expected to relieve the symptoms. One procedure or the other must come first and, on balance, dealing as we are with a work-related injury to an employee reluctant to undergo either the nerve block or the surgery, we believe it should be the presurgical workup to determine if he is an acceptable surgical risk.

thwarted. The benefit scales are so tailored as to cover only the minimum support of the claimant during disability. There is nothing to indicate that the framers of the benefit rates included any padding to take care of legal and other expenses incurred in obtaining the award." 3 A. Larson, supra at 354.39–40.

This rule, however, prevailed in Maine from the Legislature's enactment of our Workmen's Compensation Act in 1915 (P.L. 1915, ch. 295) until 1929 when an amendment (P.L.1929, ch. 300, § 40) included the following language:

"In cases where after appeal aforesaid by an employer the original order or decision rendered by the commission or by any commissioner is affirmed, there shall be added to any amounts payable under said order or decision, the payment of which is delayed by such appeal, interest to the date of payment. In all cases of appeal the law court may order a reasonable allowance to be paid to the employee by the employer for expenses incurred in the proceedings of the appeal including the record not however to include expenses incurred in other proceedings in the case." P.L.1929, ch. 300, § 40.

The last sentence remains unchanged to this day (39 M.R.S.A. § 103) and is our present concern.[3]

■ It can be argued that this last sentence of section 103 reflects a philosophy which prevails in most states[4]—that is, that an order for payment of the employee's attorney fees is a device to be utilized to penalize the employer for unjustifiably delaying the employee's enjoyment of his rightful compensation—especially when read in connection with the sentence immediately preceding it. Our Court apparently took this view originally.

In *Murray's Case,* 130 Me. 181, 188, 154 A. 352 (1931), the Law Court first ordered an employer to pay its employee's "expense on appeal"[5] in a case in which the employer's appeal was dismissed.

A similar order was added to the dismissal of the employer's appeal in *Comer's Case,* 130 Me. 373, 156 A. 516 (1931).

But when Mr. Comer's situation came back to the Law Court the next year (*Comer's Case,* 131 Me. 386, 163 A. 269 (1932)) on *his* appeal from a subsequent ruling of the Commission, the Court dismissed his appeal and there was no order for his expenses.

Neither were expenses ordered or mentioned the next year for the unsuccessful employee-appellant in *Wheeler's Case,* 131 Me. 91, 159 A. 331 (1932).

In *Chapman v. Cyr,* 135 Me. 416, 419, 198 A. 736, 739 (1938) the Court ruled that the unsuccessful petitioners were not "entitled to allowance for expenses incurred . . . on appeal."

Even when the employee was *successful* in his appeal the Court originally did not order the employer to assume the costs of his appeal. *Ferris' Case,* 132 Me. 31, 165 A. 160 (1933).

No mention of the employee's counsel fees or other expenses was made when the

3. In 1929 the statutes made no provision for an order for counsel or costs for the employee at the Commission level—and, in fact, did not do so until 1965 (P.L.1965, ch. 408, § 11).

4. *See* 3 A. Larson, supra at 354.70.

5. The Court made clear that it intended "expenses" to include attorney fees in *Kimball's Case,* 132 Me. 193, 168 A. 871 (1933) when, in dismissing an employer's appeal, it ordered that

"costs be awarded by the Justice below, including reasonable attorneys' fees." 132 Me. at 196, 168 A. at 873.

The procedure of remanding the case to the Superior Court for the fixing of these "expenses" was followed until a new practice was initiated in 1951 in *Boyce's Case,* 146 Me. 335, 81 A.2d 670 (1951) in which the Law Court itself fixed the expenses and ordered their payment. This practice has prevailed since 1951.

Court *sustained* an employer's appeal in *Simpson's Case,* 144 Me. 162, 66 A.2d 417 (1949).

In *Boyce's Case,* 146 Me. 335, 343, 81 A.2d 670, 674 (1951) the Court gave some indication of its philosophy in this area when its order for payment of expenses was preceded by the words "This being an appeal by the employer and the original decision being affirmed."

This pattern of ordering the employer to pay the employee's expenses on appeal when—and only when—the appellant is the employer and his appeal is unsuccessful was continued, without further articulation of the Court's rationale, until *Riley v. Oxford Paper Company,* 149 Me. 418, 103 A.2d 111 (1954). The Court there ordered a counsel fee of $250 paid to the *losing employee* by the employer who had succeeded in overturning an award by the Commission for incapacity resulting from an idiopathic fall. The Court apparently felt it necessary to explain its departure from its former practice, noting in its order that the case was one of novel impression and presented serious and important questions of law. *Riley v. Oxford Paper Company,* supra.[6]

Finally in 1957 the Law Court, for the first time, ordered the employer to pay the expenses of an employee's unsuccessful appeal, *LeClair v. Wallingford,* 152 Me. 342, 129 A.2d 631 (1957), which expenses the Court fixed at $250.00.

Since that time (with three unexplained exceptions when the Court failed to order counsel fees with its denial of employee's appeals) the Court has followed the practice of ordering a fixed amount to cover the employee's attorney fees and expenses in each appeal which was within the Court's jurisdiction, regardless of who prosecuted the appeal or its outcome.

With the exception of the comments in *Boyce, Riley* and *Pelchat,* the Court has

never explained its rationale concerning an employee's attorney fees on appeal but our examination of the Court's orders in the dozens of appeals since section 103 became the law in 1929 has left little doubt as to the evolution of the Court's thinking in this respect.

The unfamiliar concept that one party to an appeal should pay the other party's attorney fees was apparently not easily accepted. The language of section 103 gave the Court a discretion which the Court at first considered it should exercise affirmatively only to discourage appeals by the employer which had unjustifiably delayed the payment of benefits upon which the employee's living depended.

As the Court's experience with workmen's compensation broadened, it doubtless became apparent that the purposes of the Act are more likely to be satisfied if an employee's appeal costs are paid by the employer (and thus borne, probably, by the ultimate consumer of the economic product) instead of coming out of the compensation which is designed to sustain the employee until he regains his ability to earn for himself.

 Although it was not specifically announced, it is apparent to us that for the last decade and a half, at least, the Court has interpreted section 103 as demonstrating a legislative intent that the financial support provided by Court ordered compensation is not to be diminished by the payment of counsel fees on appeal, at least in the absence of frivolous grounds or bad faith.

 We find no discussion in the legislative record of the 84th Legislature which enacted this section which aids us in our present search for legislative intent and no discussion as to its construction can be found in the many opinions of our Court. However, the Legislature authorized the

---

6. A few years later, the Court added a similar explanation when its denial of the employee's appeal included an order for $250.00 for the

employee's "expenses". *Pelchat v. Portland Box Co., Inc.,* 155 Me. 226, 233, 153 A.2d 615 (1959).

Court to order "a reasonable allowance" and the *Kimball* Court (*Kimball's Case,* supra, 132 Me. at 196, 168 A. 871) interpreted this to include a "reasonable" attorney fee. We believe that our Court in recent years has correctly accepted the word "reasonable" to mean a fee which fairly and justly compensates the attorney in full for his services on appeal. This is our own interpretation.

■ We think that the prevailing practice in the bar has been to treat the sum ordered by the Court and paid by the employer as excluding recourse to the employee for additional compensation, but the absence of any definitive earlier statement by the Court has no doubt created some uncertainty which should be resolved.

■ We construe the intent of the Legislature to be that the costs of appeal shall be borne entirely by the employer in amounts to be ordered by this Court.

The appellant is joined by the Maine Trial Lawyer's Association (which filed an *amicus curiae* brief) in a similar inquiry as to the exclusiveness of fees allowed by the Commission under 39 M.R.S.A. § 110:

> "When the commission or commissioner finds that an employee has instituted proceedings under this chapter on reasonable grounds and in good faith or that the employer through or under his insurance carrier has instituted proceedings under this chapter, the said commission or commissioner may assess the employer costs of witness fees and a reasonable attorney's fee, when in the commission's or commissioner's judgment the said witnesses and the services of the said attorney were necessary to the proper and expeditious disposition of the case."

■ As section 110 gives the Law Court no original jurisdiction as to counsel fees for services before the Commission, in contrast to section 103, and as no ruling by the Commissioner on this issue is pre-

sented by this appeal we must hold that that question is not properly before us.

The entry will be:

Appeal sustained.

It is further ordered that the appellees pay to the appellant $550 for his counsel fees, plus his actual reasonable out-of-pocket expenses of this appeal.

All Justices concurring.